S&M Brands, Inc. v. Stein, 2018 NCBC 26.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 6894

S&M BRANDS, INC.,

      Plaintiff,

   v.

JOSH STEIN, in his official capacity
as the Attorney General of the State
of North Carolina, and the STATE
OF NORTH CAROLINA,

      Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

THIS MATTER comes before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Motion to Dismiss"; ECF No. 43).

THE COURT, after considering the Motion, the briefs in support and in opposition to the Motion, the supporting materials filed by the parties, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that Defendants' Motion to Dismiss is DENIED for the reasons set forth below.

*Troutman Sanders LLP by Christopher G. Browning, Jr. and Bryan M. Haynes for Plaintiff S&M Brands, Inc.*

*The North Carolina Department of Justice by Lauren M. Clemmons for Defendants Josh Stein and the State of North Carolina.*

McGuire, Judge.

## FACTS AND PROCEDURAL BACKGROUND

1. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts drawn from the Amended Complaint (ECF No. 36) that are relevant to the Court's determination of the motion.

## A.  *The parties*

2.  Plaintiff S&M Brands, Inc. ("Plaintiff") is a Virginia corporation formed in 1994 with its principal place of business in Keysville, Virginia.  Plaintiff is in the business of manufacturing tobacco products, including cigarettes.  Plaintiff sells its products primarily in the southeastern United States, including North Carolina.

3.  Defendant Josh Stein is the Attorney General of the Defendant State of North Carolina ("Attorney General"; collectively, Josh Stein and the State of North Carolina are "Defendants").  Plaintiff alleges that at all times Stein acted under color of State authority and sues Stein only in his official capacity. (ECF No. 36 at ¶¶ 13–14.)

## B.  *The Master Settlement Agreement and the Qualifying Statute*

4.  In or around 1994, numerous states sued the four major tobacco companies – Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard – alleging that they had deceived the public about the dangers of smoking cigarettes and had engaged in other unlawful conduct designed to mislead consumers. (*Id.* at ¶¶ 21–24.)  The lawsuit made claims for, inter alia, antitrust, fraud, racketeering, and conspiracy. (*Id.*)

5.  On November 23, 1998, forty-six states, the District of Columbia, and five territories (the "Settling States") settled the lawsuit with Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard. (*Id.* at ¶ 26.)  Four states (Florida, Minnesota, Mississippi, and Texas) had previously settled separately with Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard. (*Id.*)

6. Philip Morris, R.J. Reynolds, Brown & Williamson, Lorillard, and the Settling States executed a Master Settlement Agreement (the "MSA"). (ECF No. 36.1) Under the terms of the MSA, Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard (in the MSA, the four signatory tobacco companies are for some purposes referred to as the "Original Participating Manufacturers" and will hereinafter in this order be referred to collectively as the "OPMs") agreed to make annual settlement payments to the Settling States in perpetuity. The settlement payments are first made into a national escrow fund and are then distributed to the Settling States according to each state's "allocable share." (*Id.* at ¶ 30.) The settlement payments from the OPMs are linked to the OPMs' respective shares of the cigarette market; in other words, to the extent an OPM increases its market share in a given year, its settlement payments increase. (ECF No. 36 at ¶ 33.) The revenues generated from the OPMs' sales, however, are not considered in determining the payments. (*Id.*) Plaintiff alleges that under this method, the OPMs are discouraged from "trying to increase revenue by lowering prices" because increasing sales, and market share, would cause higher settlement payments. (*Id.*) Instead, Plaintiff alleges that the MSA payment scheme encourages the OPMs to raise prices as a means of increasing revenue without increasing market share. (*Id.*)

7. In the MSA, the OPMs agreed to substantial restrictions on their marketing, advertising, and lobbying activities. The OPMs also agreed to restrict their trade association activities and to relinquish any challenges to state laws and rules regarding tobacco. (*Id.* at ¶ 34.)

8. The MSA permits cigarette manufacturers who were not sued by the Settling States to sign the MSA along with the OPMs. Manufacturers who signed the MSA after the OPMs are known as "Subsequent Participating Manufacturers" ("SPMs"). (ECF No. 36.1 at p. 16.) If an SPM signed the MSA within sixty days of the MSA's execution *and* had a market share of cigarette sales in 1997 or 1998, that SPM had its market share "grandfathered" under the MSA and is only required to make settlement payments to the extent that the SPM's sales exceeded its 1998 market share or 125% of its 1997 market share in any given year. (*Id.* at pp. 78–80.) If the SPM either signed the MSA more than sixty days after the MSA's execution or had no market share in 1997 or 1998, that SPM must make yearly payments based on its market share for the year prior to the payment. (*Id.*)

9. Cigarette manufacturers who were not sued by the Settling States and who did not join the MSA are called "Non-Participating Manufacturers" ("NPMs"). (ECF No. 36.1 at p. 9.)

10. In order to prevent NPMs from having a competitive advantage over the OPMs and SPMs (collectively, the "Participating Manufacturers" ("PMs")), the MSA required each Settling State to enact a "Qualifying Statute." (ECF No. 36.1 at p. 65.) The MSA defines a Qualifying Statute as a "statute, regulation, law and/or rule (applicable everywhere the Settling State has authority to legislate) that effectively and fully neutralizes the cost disadvantages that the [PMs] experience vis-à-vis [NPMs] within such Settling State as a result of [the MSA]." (*Id.*) The MSA included, as an exhibit, a model Qualifying Statute that would satisfy terms of the MSA. (ECF

36.1, Ex. T.) North Carolina enacted a Qualifying Statute (the "NC Qualifying Statute") based on the model Qualifying Statute in July 1999. N.C. Gen. Stat. §§ 66-290–294.2 (hereinafter, references to the North Carolina General Statutes shall be referred to as "G.S.").

11. The NC Qualifying Statute requires that NPMs pay a statutorily-prescribed annual amount into a "Qualified escrow fund" ("Escrow Fund"). G.S. § 66-291(a)(2). Each NPM establishes its own individual Escrow Fund. An NPM's payment is calculated based on a set amount paid for each cigarette sold in North Carolina in the prior year. (*Id.*) The NPM receives any interest or appreciation on the amounts held in its Escrow Fund. Otherwise, the amounts held in the Escrow Fund can only be released: (1) to pay a judgment or settlement on certain claims by the Settling State against the NPM; (2) to refund the NPM for any overpayments into its Escrow Fund; or (3) to revert back to the NPM twenty-five years after the specific funds were paid into the Escrow Fund. G.S. § 291(b). The Attorney General is charged with administration of the Escrow Funds established by NPMs. (ECF No. 36 at ¶ 63.)

12. With regard to refunds for overpayments by a NPM into its Escrow Fund, the NC Qualifying Statute provides as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the State in a particular year was greater than the Master Settlement Agreement payments, as determined pursuant to Section IX(i) of that agreement, including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a

participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer . . . .

G.S. § 66-291(b)(2). The reference to Section IX(i) of the MSA is to the provisions regarding the payment obligations of SPMs. In other words, the NC Qualifying Statute permits release of the amount paid into an Escrow Fund by an NPM to the extent it exceeds what the NPM would have been required to pay for that year had it signed onto the MSA and was an SPM.

13. One of the adjustments required in order to determine whether an NPM has made an overpayment is the "NPM Adjustment." (ECF No. 36 at ¶¶ 46–48.) The MSA provides that if a Settling State fails to enact or fails to "diligently enforce" a Qualifying Statute, the PMs' payments to that Settling State may be reduced under the NPM Adjustment. (*Id.*) Determinations of whether the Settling States "diligently enforced" their Qualifying Statutes are made in national arbitration by a panel of three retired Article III judges. (ECF No. 36.1 at p. 88.) The arbitration process can take years to complete; for example, Defendants note in their brief that an NPM adjustment determination for MSA payments for the sales year 2003 was not finalized until 2013. (Defs.' Br. Supp. Mot. Dismiss Pl.'s Am. Compl., ECF No. 44 at p. 10.) The arbitration for sales year 2004 has not yet been completed.

### C. *Plaintiff's attempt to obtain refunds of overpayments into its Escrow Fund and the lawsuit*

14. Plaintiff did not sign the MSA and is considered an NPM under the MSA and the NC Qualifying Statute. Plaintiff established an Escrow Fund and has made yearly payments into its Escrow Fund since the NC Qualifying Statute was enacted

in 1999. Plaintiff alleges it paid more into its Escrow Fund for the sales years 2005 through 2015 than it would have paid as an SPM and that it is entitled to a refund of the overpayments pursuant to G.S. § 66-291(b)(2). (ECF No. 36 at ¶¶ 84, 114.)

15. On April 15, 2016, Plaintiff sent a letter to the Attorney General making a Public Records Act request "[i]n order to determine [Plaintiff's] overpayments into escrow." (*Id.* at ¶¶ 111–12.) Plaintiff's request sought "records sufficient to show each PM's annual MSA payments since 2004 and records sufficient to show each PM's annual cigarette sales in North Carolina and throughout the United States." (*Id.* at ¶ 112.) Plaintiff ultimately received documents in response to its request that were heavily redacted and from which Plaintiff could not determine the PMs' payments. (*Id.* at ¶ 113.)

16. On October 19, 2016, Plaintiff requested that the Attorney General authorize a release of Plaintiff's alleged overpayments of funds paid into its Escrow Fund for the sales years 2005 through 2015. (ECF No. 44, Ex. 1.) On May 25, 2017, the Attorney General replied by letter informing Plaintiff that it already had received the refund of its excess payment for the sales year 2005. (*Id.*) The letter also provided as follows:

> As to sales years 2006-2015, it is premature to consider any escrow amounts being in excess of the PMs' annual payments to the State for several reasons. First, you state that the Term Sheet settlement is a basis for your claim that S&M Brands' escrow deposit now exceeds the annual payments of the PMs for those claimed years. However the Term Sheet is simply that, terms upon which the parties are to base a final NPM adjustment settlement. A final NPM adjustment settlement is still in negotiation and is yet to be finalized and executed by the parties to the Term

Sheet. The NPM adjustment settlement between the State and the PMs is not yet final.

Secondly, North Carolina's escrow statute allows for such a release only upon final resolution of all adjustments, including the NPM adjustment. See N.C. Gen. Stat. §66-291(b)(2). As you probably are aware, the 2004 Diligent Enforcement arbitrations are now going on between the PMs and the Settling States which did not join the Term Sheet[1] as well as New York which settled separately its NPM adjustment claims with the PMs. Only sales year 2003 has been 'nearly' resolved with finality. New Mexico's appeal of its 2003 Diligent Enforcement Arbitration Award is still not final. North Carolina is still at risk of claims against it from Settling States participating in the 2004 Diligent Enforcement arbitrations as well as similar future arbitrations for sales years 2005-2015 and beyond.

In addition, as to sales years 2013-2015, the MSA provides for recalculation of amounts due from the PMs for up to four years after the payment due date. Therefore the determinations by the Independent Auditor of the PMs' annual payment amounts for those years are not yet locked and final.

Based on the above, North Carolina must decline at this time S&M Brands' request for authorization to release escrow held for the benefit of this State.

(ECF No. 44, Ex. 2.)

17. Plaintiff alleges that "the State has ample information within its possession and control to determine that S&M Brands has made excess escrow payments that should be released" and the claim that it would be premature to release Plaintiff's excess escrow payments is "a ruse to justify the State's continued unlawful retention of [Plaintiff's] property." (ECF No. 36 at ¶¶ 119–20.) Plaintiff

---

[1] In 2012, North Carolina and nineteen other Settling States settled an arbitration regarding their NPM adjustment disputes for the sales years 2003 through 2012 by signing the "Term Sheet." (ECF No. 36 at ¶¶ 102–04; ECF No. 44, Ex. 7.)

further alleges that there is no administrative process in place under which it can challenge the Attorney General's failure to release the funds. (*Id*. at ¶¶ 122–26.)

### D. Plaintiff's claims

18. On June 6, 2016, Plaintiff filed the Complaint in this action. (ECF No. 1.) Plaintiff filed the Amended Complaint on September 29, 2017.

19. In the Amended Complaint, Plaintiff alleges that it has made payments into its Escrow Fund in excess of what it would have paid under Section IX(i) of the MSA and that it is entitled to a refund of the overpayments. (ECF No. 36 at ¶¶ 84–92.) The Amended Complaint makes claims for: (1) a declaratory judgment that the amount that is currently being held in its Escrow Fund is in excess of the amount required under the NC Qualifying Statute, and that Plaintiff is entitled to a release of the excess funds (Count I); (2) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, § 34 against monopolies (Count II); (3) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, § 32 against exclusive or separate emoluments or privileges (Count III); and (4) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, §§ 1 and 19 by depriving Plaintiff of the fruits of its labor (Count IV). (ECF No. 36 at ¶¶ 138–77.)

20. In support of its claims, Plaintiff further alleges that North Carolina has taken steps to increase the burden and expense on the NPMs of complying with the Qualifying Statute for the purpose of reducing NPMs' sales. (ECF No. 36 at ¶¶ 70–83.) For example, Plaintiff claims North Carolina amended the NC Qualifying

Statute in 2005 to "dramatically decrease[]" refunds available to NPMs and "to reduce the NPMs' market share for the PMs' benefit." (*Id.* at ¶¶ 79–83.)

21.     Plaintiff also alleges that while Plaintiff's payments under the NC Qualifying Statute have increased, the OPMs and some SPMs have benefitted from reduced payment obligations to North Carolina resulting from a 2012 settlement of diligent enforcement claims by several states regarding NPMs' payments for 2003–2012. (*Id.* at ¶¶ 102–09.) The Term Sheet did not resolve the arbitration disputes of the remaining Settling States for those sales years.

22.     Finally, Plaintiff alleges that the effect of the MSA and the NC Qualifying Statute has been to create an "output cartel," or monopoly, for the PMs, permitting them to increase cigarette prices and their revenues while making it nearly impossible for Plaintiff and other NPMs to compete. (*Id.* at ¶¶ 127–37.)

23.     On October 26, 2017, Defendants filed the Motion to Dismiss. Defendants seek dismissal of all claims in the Amended Complaint. The Motion is fully briefed, and the Court held a hearing on the Motion on January 11, 2018. The Motion is now ripe for resolution.

ANALYSIS

### A.     *Count I: Declaratory judgment regarding the Escrow Fund*

24.     In the first count in the Amended Complaint, Plaintiff seeks a declaratory judgment "that the amount that is currently being held in escrow is in excess of the amount required by [G.S.] § 66-291" (ECF No. 36 at ¶ 147), and "that S&M Brands is entitled to a release of the excess funds being held in escrow." (*Id.* at

p. 28.)  In support of its claims, Plaintiff alleges "that under [G.S.] § 66-291(b)(2), the Attorney General must authorize a release of funds in excess of those that an NPM was required to place into escrow" and "[f]or each particular year from 2006 through 2016, the sums paid by S&M Brands . . . exceeded the amount that S&M Brands would have made under MSA § IX(i).  Accordingly, S&M Brands is entitled to the release of a substantial sum from its escrow account for each of these years."  (*Id.* at ¶¶ 142 and 144.)

25.    Defendants move to dismiss the first count under North Carolina Rules of Civil Procedure 12(b)(1) and 12(b)(2) (hereinafter, "Rules") on the grounds that sovereign immunity makes them immune from suit,[2] and under Rules 12(b)(1) and 12(b)(6) on the grounds that Plaintiff's claim for release of funds is not yet ripe.  Subject matter jurisdiction is a prerequisite for the exercise of judicial authority over any case or controversy.  *Hardy v. Beaufort Cty. Bd. of Educ.*, 200 N.C. App. 403, 408,

---

[2] The Supreme Court of North Carolina has declined to decide whether the defense of sovereign immunity is grounded specifically in subject matter jurisdiction or personal jurisdiction.  *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 327–28, 293 S.E.2d 182, 184 (1982).  The more recent appellate decisions have held that a defense of sovereign immunity raises an issue of personal jurisdiction under Rule 12(b)(2).  *Can Am South, LLC v. State*, 234 N.C. App. 119, 123–24, 759 S.E.2d 304, 307–08 ("[T]his Court has consistently held that: (1) the defense of sovereign immunity presents a question of personal, not subject matter, jurisdiction."); *Green v. Kearney*, 203 N.C. App. 260, 265, 690 S.E.2d 755, 760 (2010) ("[T]he general rule is that sovereign immunity presents a question of personal jurisdiction, not subject matter jurisdiction. . . .*"); but see Great American Ins. Co. v. Gold*, 254 N.C. 168, 171–72, 118 S.E.2d 792, 794 (1961) (affirming trial court's conclusion that "[t]his is an action against the State of North Carolina to restrain or avoid the collection of a tax, and this court is without jurisdiction over the *subject matter* of the action, the State of North Carolina not having permitted itself to be sued in this manner. . . ." (emphasis added)); *Dare County v. N.C. Dep't of Ins.*, 207 N.C. App. 600, 611, 701 S.E.2d 368, 376 (2010) ("[T]he extent to which the trial court had *subject matter jurisdiction* over Petitioners' request for judicial review of the consent order depends upon whether the General Assembly has enacted any statutory provisions authorizing Petitioners to seek and obtain judicial review of the consent order." (emphasis added)).

683 S.E.2d 774, 778 (2009). "When reviewing a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a trial court may consider and weigh matters outside the pleadings." *Dep't of Transp. v. Blue*, 147 N.C. App. 596, 603, 556 S.E.2d 609, 617 (2001).

26. "Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication." *Adams, Kleemeier, Hagan, Hannah & Fouts, PLLC v. Jacobs*, 158 N.C. App. 376, 378, 581 S.E.2d 798, 801 (2003), *rev'd on other grounds*, 357 N.C. 651, 88 S.E.2d 465 (2003). "[T]he plaintiff bears the burden of proving, by a preponderance of the evidence, grounds for exercising personal jurisdiction over a defendant. As such, upon a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of making out a prima facie case that jurisdiction exists." *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68, 698 S.E.2d 757, 761 (2010) (citations omitted).

27. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted). The Court construes the complaint liberally and accepts all

allegations as true. *See Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)). A motion under Rule 12(b)(6) "does not present the merits, but only whether the merits may be reached." *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### 1. Sovereign Immunity

28. "It is an established principle of jurisprudence, resting on grounds of sound public policy, that a state may not be sued in its own courts or elsewhere unless it has consented by statute to be sued or has otherwise waived its immunity from suit." *Can Am South, LLC v. State*, 234 N.C. App. 119, 125, 759 S.E.2d 304, 309 (2014); *see also Great American Ins. Co. v. Gold*, 254 N.C. 168, 173, 118 S.E.2d 792, 795 (1961) ("The State is immune from suit unless and until it has expressly consented to be sued. It is for the General Assembly to determine when and under what circumstances the State may be sued."); *Prudential Ins. Co. v. Powell*, 217 N.C. 495, 499, 8 S.E.2d 619, 621 (1940) ("It is axiomatic that the sovereign cannot be sued in its own courts or in any other without consent and permission."). However, the State can waive its sovereign immunity and consent to suit by statute.

29. The "[w]aiver of sovereign immunity may not be lightly inferred and State statutes waiving this immunity, being in derogation of the sovereign right to immunity, must be strictly construed." *Guthrie v. North Carolina State Ports Authority*, 307 N.C. 522, 537–38, 299 S.E.2d 618, 627 (1983). "When statutory provision has been made for an action against the State, the procedure prescribed by statute must be followed, and the remedies thus afforded are exclusive. The right to sue the State is a conditional right, and the terms prescribed by the Legislature are conditions precedent to the institution of the action." *Great American Ins. Co.*, 254 N.C. at 173, 118 S.E.2d at 795.

30. Defendants argue that the NC Qualifying Statute lacks a "plain, clear and unmistakable provision for suit against the State or the Attorney General" expressly waiving sovereign immunity for Plaintiff's claim. (ECF No. 44 at pp. 12–13.) Defendants contend that absent express statutory waiver of sovereign immunity, this court lacks subject matter and personal jurisdiction over Defendants. (*Id.*) Plaintiff counters that under North Carolina law, sovereign immunity does not bar a declaratory judgment action against the State if the action is one seeking to vindicate a plaintiff's property rights and interests, and there is not another avenue through which the plaintiff can protect its rights. (Pl.'s Br. Opp. Defs.' Mot. Dismiss, ECF No. 54 at p. 3.)

31. North Carolina courts have long held that "when public officials invade or threaten to invade the . . . property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though

they act or assume to act under the authority and pursuant to the directions of the State." *Corum v. Univ. of N.C.*, 330 N.C. 761, 786, 413 S.E.2d 276, 292 (1992) (citations omitted); *see also T & A Amusements, LLC v. McCrory*, 796 S.E.2d 376, 380, 2017 N.C. App. LEXIS 42, *8 (2017) ("[O]ur Supreme Court has recognized the existence of a limited exception to sovereign immunity in certain cases where plaintiffs seek declaratory or injunctive relief against State agencies that act 'in excess of the authority granted [to them] under [a] statute and invade or threaten to invade personal or property rights of a citizen in disregard of the law."); *Orange Cty. v. N.C. Dep't of Transp.*, 46 N.C. App. 350, 378, 265 S.E.2d 890, 909 (1980) (finding no sovereign immunity "[w]hen public officers whose duty it is to supervise and direct a State agency attempt to enforce an invalid ordinance or regulation, or invade or threaten to invade the personal or property rights of a citizen in disregard of law") (quoting *Schloss v. Highway Comm.*, 230 N.C. 489, 492, 53 S.E.2d 517, 519 (1949) (emphasis omitted)). Therefore, North Carolina courts have allowed declaratory judgments brought by plaintiffs seeking to protect property rights against governmental interference, because "without seeking a declaratory judgment, plaintiff would be unable to effectively protect its property rights." *Am. Treasures, Inc. v. State*, 173 N.C. App. 170, 176, 617 S.E.2d 346, 350 (2005) (quoting *McCormick v. Proctor*, 217 N.C. 23, 29, 6 S.E.2d 870, 874 (1940)); *see also Sandhill Amusements, Inc. v. Sheriff of Onslow Cty.*, 236 N.C. App. 340, 351, 762 S.E.2d 666, 675 (2014), *rev'd on other grounds*, 368 N.C. 91, 773 S.E.2d 55 (2015) (holding that sovereign immunity did not bar plaintiff's claim because "the declaratory judgment procedure

is the only method by which Plaintiffs have recourse to protect their property interests").

32.     Plaintiff seeks a declaratory judgment that it is entitled to the release of excess amounts held in its Escrow Fund.  Defendants do not dispute that Plaintiff has a property right in any excess payments it has made into its Escrow Fund, under certain statutorily-defined circumstances.  The NC Qualifying Statute does not provide a cause of action allowing NPMs to seek release of excess payments, and there is no administrative process in place for NPMs to seek release of escrow funds.  Accordingly, Plaintiff's only option for redress to protect its property rights is to seek a declaratory judgment.  Plaintiff's claim for a declaration that funds currently being held in escrow are in excess of the amount required by G.S. § 66-291, and that it is entitled to a release of the excess funds, is not barred by the doctrine of sovereign immunity under the circumstances present in this case.

2.     *Ripeness*

33.     "As with all other actions, . . . there must be a justiciable controversy before the Declaratory Judgment Act may be invoked.  There is a justiciable controversy if litigation over the matter upon which declaratory relief is sought appears unavoidable." *Ferrell v. Department of Transp.*, 334 N.C. 650, 656, 435 S.E.2d 309, 313 (1993).  An action for declaratory judgment is ripe for adjudication when "there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." *Andrews v. Alamance Cty.*, 132 N.C. App. 811, 813–14, 513 S.E.2d 349, 350 (1999); *see also Smith v. Nationwide Mut. Ins. Co.*, 97

N.C. App. 363, 366, 388 S.E.2d 624, 626 (1990). A motion to dismiss under Rule 12(b)(6) "is seldom an appropriate pleading in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail. It is allowed only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439, 206 S.E.2d 178, 182 (1974).

34. Defendants move to dismiss Plaintiff's first count under Rule 12(b)(1) or, alternatively, under Rule 12(b)(6), because the claim is not ripe. Defendants argue that Plaintiff's claim is not ripe because G.S. § 66-291(b)(2) requires release of an NPM's excess escrow payments "including after final determination of all adjustments," meaning that final determination of all adjustments must be made before the State is required to release excess escrow payments. (ECF No. 44 at pp. 13–15.) Defendants contend that "there are still outstanding adjustments for the sales years 2006–2016" that have yet to be completed, and whether, and to what extent, Plaintiff overpaid into the Escrow Fund is not yet established. (*Id.*)

35. Plaintiff argues that its first count should not be dismissed because the Amended Complaint sufficiently alleges that there is an existing and justiciable controversy over whether Plaintiff made excess payments into its Escrow Fund, and whether it is entitled to a release of the excess payments. Plaintiff also argues that the Attorney General has denied Plaintiff's request for a release of overpayments into its Escrow Fund, and that a declaratory judgment action "is the proper means for

resolving the parties' controversy." (ECF No. 54 at p. 7.) Plaintiff contends that whether or not the Attorney General is able to determine Plaintiff's overpayments at this time goes to the merits of the dispute, not whether a justiciable controversy exists. (*Id.*)

36. At the hearing on the Motion to Dismiss, Plaintiff made the additional argument that the phrase "including after final determination of all adjustments" in the NC Qualifying Statute should be read as enlarging, not limiting, the standard for the release of escrow funds and does not limit the State from making distributions prior to the final determination of all adjustments. *See N.C. Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109, 120, 143 S.E.2d 319, 327 (1965) ("The term 'includes' is ordinarily a word of enlargement and not of limitation. The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (citations omitted). Under Plaintiff's interpretation, the language "including after final determination of all adjustments" serves as a recognition that adjustments made in the future may ultimately affect the total amount of excess funds Plaintiff is entitled to, but does not prohibit the release of excess escrow funds until after those final determinations are made.

37. The Court concludes that the Amended Complaint alleges an actual and existing justiciable controversy between the parties regarding interpretation of the statute, and regarding whether Plaintiff has made escrow payments in excess of those required by the statute. That is all that is required of Plaintiff at the pleadings stage.

Defendants' motion to dismiss the First Count in the Amended Complaint should be DENIED.

### B. Counts II–IV: Declaratory judgment regarding Constitutional claims

38. Plaintiff's Second, Third, and Fourth counts seek declaratory judgments that the NC Qualifying Statute violates the Constitution of North Carolina. Plaintiff alleges that the NC Qualifying Statute: protects the market shares and revenues of the OPMs thereby creating a monopoly in violation of the constitutional prohibition against monopolies under art. I, § 34; provides a separate emolument or privilege for the OPMS and to the disadvantage of NPMs like Plaintiff in violation of art. I, § 32; and requires NPMs to "make substantial payments in excess of PMs' payments," and holds the escrow funds for 25 years, thereby depriving Plaintiff of "substantial fruits of its labor." (ECF No. 36 at ¶¶ 148–77.)

39. Plaintiff frames its constitutional claims as "as applied" challenges, rather than as facial challenges.[3] *State v. Packingham*, 368 N.C. 380, 392, 777 S.E.2d 738, 748 (2015), *rev'd on other grounds*, *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ("A statute that is constitutional on its face nevertheless may be

---

[3] Plaintiff's arguments in its briefs regarding counts two through four veer between arguments that the NC Qualifying Statute is unconstitutional as applied to Plaintiff, and unconstitutional on its face. The distinction, however, is not critical for purposes of deciding a motion to dismiss. "An appellant may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *See, e.g.*, *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008). "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 333 (2010).

unconstitutional as applied to a particular defendant.").  The Supreme Court of North Carolina has held

> An as-applied challenge contests whether the statute can be constitutionally applied to a particular defendant, even if the statute is otherwise generally enforceable.  A facial challenge maintains that no constitutional applications of the statute exist, prohibiting its enforcement in any context.  The constitutional standards used to decide either challenge are the same.

*Id.* at 383, 777 S.E.2d at 743.  For purposes of deciding Defendants' Motion, the Court will treat Plaintiff's constitutional claims as challenges to the statute "as applied" to Plaintiff.

40.     Defendants seek dismissal of Plaintiff's constitutional challenges solely under Rule 12(b)(6).  (ECF No. 43 at p. 2.)  Dismissal under Rule 12(b)(6) is only warranted "'where an insurmountable bar to recovery appears' on the face of a complaint . . . Such an insurmountable bar may consist of an absence of law to support a claim, an absence of facts sufficient to make a good claim, or the disclosure of some fact that necessarily defeats the claim." *Kelly v. Polk Cty. N.C.*, 2018 N.C. App. LEXIS 65, \*5 (citing *Peacock v. Shinn*, 139 N.C. App. 487, 492, 533 S.E.2d 842, 846 (2000)).

41.     Defendants contend that the NC Qualifying Statute is a valid exercise of the State's police power and is rationally related to the State's interest in discouraging the use of tobacco products to protect public health and welfare, and any incidental imposition on Plaintiff's constitutional rights is justified by that interest. (ECF No. 44 at pp. 19, 20, 21, and 22–23.)  Plaintiff alleges that the NC Qualifying

Statute does not "preserve the public health, safety, or welfare" or otherwise serve the public interest. (ECF No. 36 at ¶¶ 154, 165, and 176.) Defendants argue that Plaintiff's allegations that the statute does not serve a public interest are legal conclusions that should be disregarded by the Court. (ECF No. 44 at p. 19.)

42. Defendants further argue that courts in other jurisdictions have concluded that other states' Qualifying Statutes do not violate federal constitutional rights, and that this Court should do the same. *See, e.g.*, *KT&G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) ("Oklahoma's amended escrow statute is rationally related to the state's legitimate interests in promoting health and insuring the availability of adequate funds to address the state's future tobacco-related health care costs."); *Grand Rivers Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 175 (2d Cir. 2005) ([Discussing the New York escrow statute and stating "the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses.); *Star Scis., Inc. v. Beales*, 278 F.3d 339, 361 (4th Cir. 2002) ("Virginia's qualifying statute serves the legitimate state interest of ensuring that Virginia has a source of recovery for future smoking-related healthcare costs attributable to tobacco manufacturers who have not subscribed to the Master Settlement Agreement and who, therefore, are not already compensating the Commonwealth for these healthcare costs."). (*Id.* at p. 23.)

43. The Court has considered Defendants' argument that the NC Qualifying Statute serves North Carolina's interest in promoting the public health and welfare, but it is not persuaded that it is appropriate to reach the issue at this early stage of

the case. The NC Qualifying Statute does not contain a provision stating the statute's purpose. To the contrary, unlike other states that adopted the model Qualifying Statute, North Carolina declined to adopt the first section of the model statute summarizing the public health concerns underlying the MSA and the Qualifying Statute. (ECF 36.1, Ex. T, pp. T-1 and T-2.) *See, e.g.*, N.Y. Pub. Health § 1399-nn (2018) (New York) (adopting the Model Qualifying Statute's "Findings and Purpose" provision declaring that it is in the interest of New York to establish an escrow fund because of public health concerns); G.A. Code Ann. § 10-13-1 (2018) (Georgia); Ariz. Rev. Stat. § 44-7101 (2018) (Arizona). In addition, North Carolina's appellate courts have not yet had an opportunity to decide whether the NC Qualifying Statute serves the State's interests. The Court believes further development of the record is necessary to adequately address whether the NC Qualifying Statute, as interpreted and applied by the Attorney General to Plaintiff, serves the public health or other compelling State interests.

44. The Court has thoroughly considered the voluminous and detailed allegations contained in the Amended Complaint and concludes that they sufficiently allege claims for declaratory judgment regarding whether the Attorney General has applied the NC Qualifying Statute in a manner that violates Plaintiff's rights under the North Carolina Constitution. Defendants raise compelling arguments, and those arguments may ultimately prevail on Plaintiff's constitutional claims. At this stage, however, Plaintiff is required only to place Defendants on notice of the claims it is raising. *Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014)

("Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought.")  Defendants' motion to dismiss counts two, three, and four of the Amended Complaint should be DENIED.

THEREFORE, IT IS ORDERED that:

45.    Defendants' Motion to Dismiss is DENIED.


This the 2nd day of April, 2018.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases